UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH ANTHONY BARRETT,<br><br>    Plaintiff,<br><br>    v.<br><br>BRUMFIELD, et al.,<br><br>    Defendants. | Case No. 21-cv-06802-HSG<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO PRO SE PRISONER MEDIATION PROGRAM; STAYING ACTION; DIRECTIONS TO CLERK**<br><br>Re: Dkt. No. 15 |

Plaintiff, an inmate at San Quentin State Prison, has filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that SQSP correctional officials McLean, Faaita, Del Rosario, Ramirez, Robinson and Adamik used, or authorized the use of, excessive force in violation of the Eighth Amendment when they extracted Plaintiff from his cell on December 23, 2018. *See generally* Dkt. Nos. 1, 3. Defendants have filed a motion for summary judgment. Dkt. No. 15. Plaintiff has filed an opposition, Dkt. No. 22, and Defendants have filed a reply, Dkt. No. 23. For the reasons set forth below, the Court DENIES Defendants' summary judgment motion. Dkt. No. 15.

**DISCUSSION**

**I.    Factual Background[1]**

    **A.    Events Prior to Cell Extraction**

Plaintiff is a condemned inmate. Plaintiff has a history of self-harm and lethal suicide attempts. Dkt. No. 15-1 ("Barrett Depo.") at 31:17, 142:5-9. His history of self-harm includes

---

[1] The following facts are undisputed unless otherwise indicated.

multiple serious suicide attempts, at least a couple of which were lethal, defined as serious attempts that would have resulted in his death had he not received medical treatment. Barrett Depo. 31:21-32:1. Plaintiff's primary method of self-harm is cutting himself. Barrett Depo. 32:2-4. On or around February 4, 2017, Plaintiff attempted suicide by cutting his arms. Barrett Depo. 32:5-33:1. Plaintiff attempted suicide one additional time after February 4, 2017. Barrett Depo. 32:13-18.

In the latter half of 2018, correctional officials were "torment[ing]" Plaintiff by tampering with his meals. Correctional officials removed food from his trays and adulterated the food. Barrett Depo. 62:10-22. Due to his frustration over the food issues, Plaintiff "gassed"[2] a correctional officer. Barrett Depo. 62:14-16. In response, Plaintiff was moved to SQSP's disciplinary unit, the Adjustment Center ("AC"), in early December 2018. Barrett Depo. 29:18-29:19, 62:14-63:04, 126:01-126:04, 133:23-133:25.

Plaintiff was housed on the first floor of the AC in Cell No. 1. Cell No. 1 is approximately six and a half feet wide by nine feet in length. Barrett Depo. 50:16-18. The cell is outfitted with a concrete slab bunk affixed to the wall immediately to the left of the cell entrance. There is a combined sink and toilet fixture along the back of the cell. Barrett Depo. 51:4-9. There are three split windows in the front of the cell: one in the cell wall and two in the door. Each window measures approximately 5 inches wide by 18 inches tall. There is another window in the back of the cell, measuring approximately one foot by one foot, that is covered by a steel door.

While housed at the AC, Plaintiff continued to be "torment[ed]" by correctional officials. Barrett Depo. 62:10-18m 63:20-22. When Plaintiff arrived at the AC, he was not provided sufficient bedding or a spoon to eat with; he was not given a full issuance of laundry; and he was given a torn up, filthy mattress to sleep on. 52:10-11, 53:1-5. At some point, someone broke his sink, resulting in Plaintiff having no drinking water. 55:12-13. Correctional officials continued to interfere with Plaintiff's food. Plaintiff informed his clinician of the issues with his food so that she would understand that that his disciplinary issues and rules violations, i.e., refusing meals and

---

[2] Gassing is the throwing of human waste. Barrett Depo. 30:11

boarding up, were not attempts at self-harm, but were attempts to get food. Barrett Depo. 60:20-61:2.

Plaintiff wanted to resolve his problems with his living conditions and the AC staff by getting the watch commander, who was stationed outside of the AC, to come to the AC. Barrett Depo. 61:20-24. Plaintiff stated that because his problems were caused by the AC correctional officers, his problems could not be resolved unless he brought in somebody from outside the AC:

> [T]he whole point was the problem to be put before someone outside of the unit. Because everyone on the inside of the unit understands that the adjustment center is a closed, locked environment. I can't leave on my own accord. No one can come in unless they let them in. And the people running the program [at the adjustment center], you know, they're the ones that you're dealing with. So if you're bringing the problem to the people causing the problem, the problem doesn't get solved. What I was trying to do is get somebody outside of the unit who was not part of the problem to help resolve the problem.

Barrett Depo. 75:23-76:10. It was Plaintiff's understanding that refusing to turn in his plastic dinner tray or boarding up would require AC staff to notify unit staff and the watch commander. Barrett Depo. 61:18-24. In his deposition, Plaintiff described "boarding up" as a way to force AC staff to resolve issues:

> Q: You indicated that you had to board up in order to get your bedding. Is that an example of boarding up sort of a form of protest or way of making a demand?
>
> A: Yeah. It's more a way of – how can I put this. Say there's an issue that can't be resolved. I'll give you a hypothetical. Say you didn't get a roll of toilet paper, and you've been asking for this roll of toilet paper, and they just won't give you a roll of toilet paper.
> So in order to get the toilet paper and because no one can solve the problem, you cover the cell front because this triggers a chain of events. This requires the involvement of other staff. Nine times out of ten, it will get to the point of where they're like, do we really want to use physical force to go in here for a roll of toilet paper or is it a legitimate request to give them a roll of toilet paper. So that's an example of why you might do it.

Barrett Depo. 53:13-54:5.

Plaintiff boarded up in the AC one other time prior to December 23, 2018. On that occasion, Plaintiff held on to his dinner tray and hung a sheet to obstruct prison officers' view of the part of the cell where he was sitting. Plaintiff boarded up because he wanted to communicate with correctional officers outside of the building. Barrett Depo. 61:18-24. The boarding up was moderately successful in that it prompted the sergeant working that watch to provide Plaintiff with bedding, adequate clothing, a spoon to eat with, and some food to eat, and to direct maintenance to

3

fix Plaintiff's sink.  Barrett Depo. 54:21-56:7.

## B.     December 23, 2018

On December 23, 2018, Plaintiff was still having issues with the way his meals were being served.  Barrett Depo. 57:18-20.  That morning, Plaintiff's breakfast was delivered to him on a paper tray with the bottom of the tray soaked in urine.  Plaintiff flipped the tray over in the tray slide and received a rules violation report for acting disrespectfully with regarding to the breakfast delivery.  Barrett Depo. 57:25-58:10.  Later that day, Plaintiff "boarded up" his windows.  Plaintiff does not recall what he used to board up but the material was sufficient to prevent correctional officers from looking into the cell.  Barrett Depo. 57:5-11.  Plaintiff's "specific reason [for boarding up] was to get that chain of events rolling for a cell extraction protocol, beginning with notification of the unit staff who would then notify the watch commander who [Plaintiff] was trying to get to come to the building, because you can't get communication going outside of the building, so [Plaintiff] was trying to get somebody to come over."  Barrett Depo. 61:17-24.  Plaintiff states that it was understood by everyone that his safety was not at issue and that he was just "trying to get somebody into the building so [he] could get the food situation solved, so [he could] eat a clean, complete meal for a change."  Barrett Depo. 62:1-22.  Plaintiff expected that a cell extraction could happen and that he could get beaten up during an extraction, but did not expect to be as severely injured as he was.  Barrett Depo. 63:19-24.

Sometime between 7:00 to 8:00 pm, defendants Ramirez and Faaita noted that Plaintiff had boarded up and could not be observed.  Dkt. No. 15-5 ("Ramirez Decl.") ¶ 3; Dkt. No. 15-3 ("Faaita Decl.") ¶ 3.  Defendant Ramirez called out to Plaintiff and instructed him to take down the window coverings.  Ramirez Decl. ¶ 3; Faaita Decl. ¶ 4.  Plaintiff did not respond.  Ramirez Decl. ¶ 3; Faaita Decl. ¶ 4.  Defendants Ramirez and Faaita notified defendant Adamik.  Ramirez Decl. ¶ 3; Faaita Decl. ¶ 4; Dkt. No. 15-2 ("Adamik Decl.") at ¶¶ 2-3.  Plaintiff wanted to resolve his problems with his living conditions and the AC staff by getting the watch commander, who was stationed outside of the AC, to come to the AC.  Barrett Depo. 61:20-24.  Defendant Adamik attempted to verbally engage with Plaintiff without success.  Adamik Decl. ¶ 3; Ramirez Decl. ¶ 4; Faaita Decl. ¶ 5.  Plaintiff states that he refused to speak to any of the correctional officers because

4

he wanted to involve the chain of command.  Barrett Depo. 65:14-19.  Defendant Adamik notified defendant Robinson of the situation.  Dkt. No. 15-2 at 6; Adamik Decl. ¶ 3.

The parties disagree as to why Plaintiff was extracted from his cell and how the cell extraction took place.

Plaintiff alleges the following.

Plaintiff alleges that correctional officials extracted him with the intention of beating him up, as part of an ongoing campaign of harassment against him.

When defendant Robinson arrived at his cell, Plaintiff told him that there was a problem with his food.  Barrett Depo. 65:14-19.  Defendant Robinson ordered Plaintiff to take down the material covering the windows so that Plaintiff could be seen.  Plaintiff refused.  During this conversation, somebody went behind Plaintiff's cell, opened the port in the rear of the cell, and directed a light through the port.  Plaintiff was concerned that whoever was back there intended to shoot him with blocks or spray him with pepper spray.  Based on light being directed into his cell from the rear, chatter on the tier earlier, and the continued provocation against him by correctional officials, Plaintiff believed that correctional officials were planning a cell extraction and to beat him up.  Barrett Depo. 66:12-24, 71:16-25, 72:1-73:21.

Defendant Robinson told Plaintiff, "Come over here so I can talk to you."  Plaintiff refused, saying, "I'm not coming over there because you're gone to line me up for a shot."  Plaintiff repeated, "You're lining me up for a shot."  Defendant Robinson responded, "You are right."  Defendant Robinson then opened the food port, covered it with a shield, and shone a light into the port to try to gain a view of the cell interior.  The cell doors opened, and defendants McLean, Faaita, Del Rosario, and Ramirez entered Plaintiff's cell to extract him.  Barrett Depo. 66:12-24, 71:16-25, 72:1-14.

Plaintiff had anticipated that defendant Robinson was planning a cell extraction and was braced for the confrontation.  He intended to resist and fight back if he could.  However, he was unable to resist or fight back because of how the cell extraction unfolded.  When the shield officer entered the cell, Plaintiff was standing to the officer's left, on the bunk.  The shield officer charged at Plaintiff with the shield and pressed Plaintiff against the wall with the shield.  As soon as

Plaintiff was pinned to the wall, the other officers entered the cell. Plaintiff was clubbed in the head by either defendant Faaita or defendant McLean, causing scalp lacerations that required ten staples to close. Defendants then stretched out Plaintiff face down on the ground. Defendant Ramirez sat on the small of Plaintiff's back and applied a wrist restraint to Plaintiff's right arm. At that point, Plaintiff was completely restrained. Defendant McLean could have applied a wrist restraint to Plaintiff's left hand without difficulty. Instead, defendant McLean intentionally dislocated Plaintiff's elbow as follows. Defendant McLean stepped over the bunk, grabbed and turned Plaintiff's left wrist, put his hand behind Plaintiff's elbow, and cranked Plaintiff's left arm back until it folded over completely in the opposite direction. When the handcuffs were later applied to the wrist restraints, the handcuffs were applied so as to injure Plaintiff, resulting in a broken wrist. Barrett Depo. 84:5-91:5, 95:19-96:10. Plaintiff denies punching Defendants, pointing out that there are no injuries, abrasions or swelling to his hands, as would be expected if he had punched Defendants. Barrett Depo. 150:7-14.

Defendants provide the following account of events.

Defendant Robinson attempted to verbally engage with Plaintiff and met with "negative results." As a result, defendant Robinson instructed defendant Adamik to form a medical emergency extraction team. Defendant Adamik assigned defendants Del Rosario, Ramirez, McLean and Faaita to the extraction team, and staged the team outside Plaintiff's cell. Defendant Robinson again attempted to verbally engage Plaintiff but again met with "negative results." Dkt. No. 15-2 at 6; Robinson Decl. ¶ 4.

Defendant Robinson ordered defendant Adamik to form a team to extract Plaintiff from his cell on an emergency basis to determine Plaintiff's status and ensure his safety. Defendant Adamik assigned the following correctional officers to the four-person extraction team: J. Del Rosario (shield); S. Faaita (baton); A. Ramirez (handcuffs); and M. McLean (leg restraints). Adamik Decl. ¶ 4; Robinson Decl. ¶¶ 5, 6. While the team was suiting up and preparing, defendant Robinson made a final attempt to contact Plaintiff through the food port slot in the cell door by shining a flashlight into the slot. Because defendant Robinson was unable to see Plaintiff, defendant Robinson determined that Plaintiff had positioned himself out of view between the cell

front and the foot of the concrete bed slab. Robinson Decl. ¶ 7. Because Defendant Robinson saw no movement from Plaintiff and heard nothing from Plaintiff, he feared that Plaintiff had harmed himself. Robinson Decl. ¶ 8. As a result, around 2006 hours, defendant Robinson instructed defendant Adamik to initiate the cell extraction, while also updating Central Control that an emergency medical extraction was underway and summoning a response from the Treatment and Triage Area. Robinson Decl. ¶ 8.

The cell was dark when the extraction team entered. Defendant Del Rosario entered the cell first. Plaintiff immediately charged from his bed slab and began striking defendant Del Rosario on his head with closed fists. Defendant Del Rosario drove Plaintiff back into the cell, while taking blows to the head. Defendant Del Rosario was followed closely by defendants Ramirez, McLean and Faaita. Plaintiff fought the extraction team, requiring the extraction team to use physical force and the weight of their bodies to secure Plaintiff. In an attempt to stop Plaintiff from striking defendant Del Rosario, defendant McLean struck Plaintiff in the head with his baton. Defendants Del Rosario and Faaita pulled Plaintiff to the floor. While on the floor, Plaintiff continued to resist by kicking his legs wildly, swinging his arms in an effort to strike out at the officers and arching his back. Defendant Ramirez used his body weight to pin Plaintiff to the ground and sat on Plaintiff's lower back while defendants Ramirez and McLean secured Plaintiff in handcuffs and defendant Faaita placed Plaintiff in leg restraints. Throughout the extraction, Plaintiff failed to comply with officers' orders to stand down and submit to restraints. Plaintiff's resistance and struggle against the extraction team resulted in all members of the extraction team suffering minor injuries and abrasions. Defendant Faaita sustained minor abrasions and an injury to his left hand. Defendant Ramirez sustained abrasions and a swollen right hand and wrist, and also injured his right ankle. Defendant Ramirez was directed to take three months for recovery for his ankle and continues to have problem with ankle stability to this day. Adamik Decl. ¶¶ 7-11; Faaita Decl., ¶¶ 7-10; McLean Decl., ¶¶ 5-8; Ramirez Decl. ¶¶ 6-8; Robinson Decl.¶ 14.

The remaining facts are undisputed.

The cell extraction took 30 to 45 seconds. Plaintiff sustained the following injuries from the cell extraction: a fractured left wrist, a dislocated left elbow, and a scalp laceration. Barrett

Depo. 140:21-141:14. After Plaintiff was removed from the cell, he was placed in a wheelchair and taken to the on-site infirmary for evaluation. Plaintiff was then taken by ambulance to Marin General Hospital where he was treated in the emergency room. Plaintiff returned to SQSP in the early hours of December 24, 2018. Depo. 98:6-103:10. Upon his return, Plaintiff was involuntarily housed in the Mental Health Crisis Beds facility ("MHCB") until January 10, 2019. Dkt. No. 22 at 6. While housed in MHCB, Plaintiff was severely restricted as to what he could do and what he could access. He was also determined to be incapable of making decisions for himself. Plaintiff was unable to receive mail, access writing materials, or make phone calls. Plaintiff was only allowed reading material and his clothing. Dkt. No. 22 at 7, 9-11. On January 10, 2019, a *Vitek* hearing was held, at which Plaintiff was deemed incapable of informed consent and it was determined that Plaintiff should be transferred to the Psychiatric Inpatient Program for mental health treatment. Dkt. No. 22 at 7, 29.

Plaintiff was issued a rules violation report ("RVR") for battery on a peace officer (Cal. Code Regs. § 3005(d)(1), in connection with the December 23, 2018 cell extraction. At the RVR hearing, Plaintiff stated that while he was trying to batter staff, the only contact he made was with the shield and he never hit any staff member. Dkt. No. 15-4 at 17. Plaintiff was found guilty of the RVR. Dkt. No. 15-4 at 8-22.

**C.     Grievance History and Filing of Complaint**

At the relevant time, the California Department of Corrections and Rehabilitation ("CDCR") provided an administrative grievance process allowing an inmate to grieve any departmental decision, action, condition, or policy that had a material adverse effect on the inmate's health, safety, or welfare. 15 Cal. Code Regs. § 3084.1(a) (2019).[3] The CDCR addressed grievances that alleged staff misconduct separately from grievances that challenged

---

[3] The regulations that set out the features of the administrative remedies process for California prisoners underwent a substantial restructuring in 2020. On March 25, 2020, and effective June 1, 2020, 15 Cal. Code Regs. §§ 3084–3084.9 were repealed and replaced with renumbered and amended provisions at sections 3480 through 3487. Because the relevant events took place in 2018-2019, the current administrative grievance process does not apply to Plaintiff's claim. All the citations in this order to the California regulations are to the regulations in place during the relevant period of this action, rather than to the current regulations.

8

other issues, with grievances that alleged staff misconduct requiring expedited processing. 15 Cal. Code Regs. § 3084.5(b)(4) (2019) (grievances are screened to determine whether they should be processed as routine grievance, processed as staff complaint grievance inquiry, or referred to Internal Affairs for investigation/inquiry); 15 Cal. Code Regs. § 3084.9(i) (2019) (setting forth process for staff misconduct complaints).

To prepare his grievance, Plaintiff sought to obtain the names of the correctional officers involved in the cell extraction and documentary support for his claim. Dkt. No. 22 at 3. Because Plaintiff was housed in the MHCB, he had to rely on a staff assistant to procure this information and he had to receive approval from his doctor to have the documents in his cell. Dkt. No. 22 at 3.

Sometime in January 2019, Plaintiff filed a staff misconduct complaint alleging use of force during the December 23, 2018 cell extraction. Barrett Depo. 109:3-10, 112:5-11. On January 23, 2019, Plaintiff was interviewed by Lt. Petrovic and an unnamed sergeant as part of the processing of the staff misconduct complaint. Barrett Depo. 111:8-13; 114:2-9. At the interview regarding the staff complaint, the sergeant handed Plaintiff "another 602 [grievance] form" and ordered him to complete the form. Plaintiff completed the form, indicating on the form that he was "referenc[ing] the same incident [in this grievance] as the other one enclosed." Barrett Depo. 111:8-13. Plaintiff did not sign this grievance and the earliest date listed on this grievance form is February 25, 2019. Barrett Depo. 111:21-112:4. The grievance was ultimately denied at the third level of review with a decision issued on September 11, 2019. Barrett Depo. 103:15-25, 106:6-107:3.

On August 18, 2021, Plaintiff signed both the complaint that commenced this action, Dkt. No. 1 at 3, 6, and the related *in forma pauperis* application, Dkt. No. 2 at 4. Plaintiff requested the necessary account information for the *in forma pauperis* application from his counselor and the trust office. These documents were provided on August 23, 2021. Dkt. No. 22 at 2, 8. The complaint and the *in forma pauperis* application were mailed in separate envelopes. Both envelopes indicate that they were handed to correctional officials on August 23, 2021. Dkt. No. 1-1 at 2; Dkt. No. 22 at 8. The Court received and docketed the complaint on September 1, 2021. Dkt. No. 1.

## II. Motion for Summary Judgment

Defendants argue that they are entitled to summary judgment because this action is barred by the statute of limitations. Defendants also argue that they are entitled to summary judgment on the merits of the Eighth Amendment claims, arguing that the extraction team officers, defendants Del Rosario, Faaita, Ramirez, and McLean, used appropriate force in a good-faith response to an emergency situation created by Plaintiff; that defendants Robinson and Adamik were not deliberately indifferent to Plaintiff's safety in authorizing or allowing the cell extraction; and that, in the alternative, Defendants are entitled to qualified immunity. Dkt. Nos. 15, 23. Plaintiff argues that this action is timely filed because he is entitled to tolling for the time he was actively exhausting administrative remedies, December 24, 2018 to September 11, 2019; and because he is entitled to the additional 2-year tolling period set forth in Cal. Civ. Proc. Code § 352.1. Plaintiff also argues that Defendants used excessive force because the cell extraction was not done out of concern for his safety, and because Defendants used more force than was necessary to subdue him and did so for the purpose of causing him harm. *See generally* Dkt. No. 22.

### A. Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings

10

and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. If the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## B. Statute of Limitations

Section 1983 does not contain its own limitations period. The appropriate period is that of the forum state's statute of limitations for personal injury torts. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). In California, the general residual statute of limitations for personal injury actions is the two-year period set forth at Cal. Civ. Proc. § 335.1,[4] and this is the applicable state statute in Section 1983 actions. The statute of limitations is tolled for the time it takes for a prisoner to administratively exhaust his underlying grievances. *See Brown v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005) ("the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process"). The Ninth Circuit has held that prisoners are entitled to tolling while they are "actively exhausting [their administrative] remedies." *Soto v. Sweetman*, 882 F.3d 865, 875 (9th Cir. 2018) (finding that inmate was entitled to tolling from April 2010, when incident happened, to May 2010, when grievance filed, and also from January 2014, when inmate submitted new inmate letter that

---

[4] Cal. Civ. Proc. § 352.1 recognizes imprisonment as a disability that tolls the statute of limitations when a person is "imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term of less than for life." Cal. Civ. Proc. Code § 352.1(a). The tolling is not indefinite, however; the disability of imprisonment delays the accrual of the cause of action for a maximum of two years. *See id.* Plaintiff is not entitled to this tolling because he is sentenced to death, which is not a term of less than life.

11

1   restarted grievance process, to May 2014, when inmate received final decision regarding new
2   grievance; inmate was not entitled to tolling from May 2010 to January 2014 because court found
3   he had abandoned the administrative remedy process during this time period by not taking any
4   steps to exhaust).

5   The parties agree that Plaintiff's claim accrued on December 23, 2018, the date of the cell
6   extraction. The parties disagree as to the date this action was filed, and disagree as to the dates
7   during which Plaintiff is entitled to tolling due to exhaustion of administrative remedies.

8   With respect to the date of filing, Plaintiff argues that the action was constructively filed as
9   of August 18, 2021, the date that he signed the complaint, and not August 23, 2021, the date that
10  the complaint was given to prison authorities for mailing, because the three-day delay between
11  signing and mailing was due to his waiting for prison authorities to provide him his trust account
12  information, which he required to initiate this action. Dkt. No. 22 at 8. Defendants argue that this
13  action commenced on September 1, 2021, when his complaint was docketed by the Court. Dkt.
14  No. 15 at 22; Dkt. No. 23 at 3. Defendants fail to account for the "prison mailbox rule" of
15  *Houston v. Lack*, 487 U.S. 266 (1988), which provides that a prisoner's Section 1983 complaint is
16  deemed filed when he hands it to prison authorities for mailing to the district court.[5] *Douglas v.*
17  *Noelle*, 567 F.3d 1103, 1107 (9th Cir. 2009). Here, the record is unclear as to when Plaintiff
18  provided the complaint to prison authorities for mailing. It is unclear if (1) Plaintiff provided his
19  complaint to prison authorities on August 18, 2021, the date he signed the complaint; prison
20  officials coordinated the collection of the supporting documents for the *in forma pauperis*
21  application; and prison officials ultimately sealed the envelopes for the complaint and the *in forma*
22  *pauperis* application on August 23, 2021, in preparation for mailing; or (2) Plaintiff signed his
23  complaint on August 18, 2021; waited until he had received the supporting documents for the *in*
24  *forma pauperis* application; and handed the envelopes to correctional officers for mailing on

---

[5] Plaintiff argues that the Ninth Circuit has interpreted the prison mailbox rule as holding that a petition is constructively "filed" on the date it is signed, citing to *Roberts v. Marshall*, 627 F.3d 768, 770 n.1 (9th Cir. 2010), rather than the date it is mailed. Because this case was timely filed whether it was filed on August 18, 2021, or August 23, 2021, the Court need not address whether the prison mailbox rule applies to the date the complaint is signed or the date the complaint is mailed.

12

August 23, 2021. Regardless of whether the complaint was handed to prison authorities for mailing on August 18 or August 23, 2021, this complaint is timely because Petitioner is entitled to tolling from December 23, 2018 to September 11, 2019, as explained below. Accordingly, even if Plaintiff filed his complaint on August 23, 2021, his complaint is timely.

With respect to the tolling period for exhaustion of administrative remedies, the parties agree that Plaintiff's administrative remedies were exhausted on September 11, 2019. The parties disagree as to whether Plaintiff is entitled to tolling for the time period between December 23, 2018, when the claim accrued, and January 23, 2019. Because the grievance is not in the record before the Court, the Court can only rely on Plaintiff's deposition testimony to ascertain when the grievance might have been filed. The record indicates that Plaintiff was housed in the MHCB from December 24, 2018 until January 10, 2019, with no access to writing materials and only allowed to possess reading material and his clothing. Dkt. No. 22 at 7, 9-11. Plaintiff stated in his deposition that he had filed a staff complaint regarding the cell extraction prior to January 23, 2019. The staff complaint appears to have been converted to a grievance on January 23, 2019 at the interview regarding the staff misconduct complaint.[6] At that interview, a correctional officer instructed Plaintiff to fill out a grievance form regarding the incident already raised in the staff misconduct complaint. Barrett Depo. 111:8-13. Viewing the record in the light most favorable to Plaintiff, the Court presumes that Plaintiff was actively exhausting his administrative remedies from December 23, 2018, the date of the cell extraction, in that he was attempting to obtain the necessary information to submit the grievance; that he was unable to file a grievance while housed in MHCB; and that he filed a staff misconduct complaint soon after his release from MHCB, sometime prior to January 23, 2019. Petitioner is therefore entitled to tolling of the limitations period from December 24, 2018, the day after the incident, until September 11, 2019, when he received a final decision on his grievance. His complaint, whether filed on August 18, 2021, or August 23, 2021, was thus timely filed within the two-year statute of limitations.

---

[6] If prison officials determine that a staff misconduct complaint shall not be accepted as a staff complaint, the complaint is then processed as a routine grievance pursuant to 15 Cal. Code Regs. § 3084.5(b)(4)(A). 15 Cal. Code Regs. § 3084.9(i)(2).

### C. Eight Amendment Claims

Defendants allege that they are entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claims because Plaintiff created an emergency situation requiring the use of force to ensure his safety; defendants Del Rosario, Faaita, Ramirez, and McLean used only the force necessary to secure Plaintiff and ensure his well-being; and defendants Adamik and Robinson were not deliberately indifferent to Plaintiff's safety by allowing the cell extraction. In the alternative, Defendants argue that they are entitled to qualified immunity. *See generally* Dkt. Nos. 15, 23. Plaintiff alleges that Defendants were aware that there was no risk to Plaintiff's safety; that defendants Adamik and Robinson authorized a cell extraction with the intent to harm him; that defendants Del Rosario, Faaita, Ramirez, and McLean used more force than was necessary to subdue him; and that the severity of the force used in the cell extraction was intended to punish him because of ongoing tensions with correctional staff. *See generally* Dkt. No. 22.

#### 1. Legal Standard

The treatment a prisoner receives in prison is subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official violates the Eighth Amendment when: (1) "the deprivation alleged [is] sufficiently serious;" and (2) the prison official possesses a "sufficiently culpable state of mind." *Id.* at 834. When prison officials are accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). Five *Hudson* factors are generally considered in determining whether a violation occurred: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003) (citing *Hudson*, 503 U.S. at 7). To be liable under the Eighth Amendment for the use of force by subordinate prison guards, a supervisor's actions must have resulted from malice, sadism or an intent to cause the inmate harm. *Jeffers v. Gomez*, 267 F.3d 895, 912-13 (9th Cir. 2001) (applying "malicious and sadistic" standard to claim that prison

14

1   guards used excessive force when attempting to quell prison riot, but applying "deliberate
2   indifference" standard to claim that guards failed to act on rumors of violence to prevent riot).
3   The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the
4   safety of prisoners. *Farmer*, 511 U.S. at 832. A prison official is deliberately indifferent if he
5   knows of and disregards an excessive risk to inmate health or safety by failing to take reasonable
6   steps to abate it. *Id.* at 837.

### 2. Analysis

The "core judicial inquiry in an Eighth Amendment excessive force case is whether the defendant officers acted in bad faith with the intent to harm the inmate." *Hoard v. Hartman*, 904 F.3d 780, 790 (9th Cir. 2018) (citations and internal quotation marks omitted). There is a triable issue of material fact as to whether Defendants acted in bad faith with the intent to harm Plaintiff, because it is disputed whether there was a need for the cell extraction and whether the force used during the cell extraction was applied maliciously and sadistically to cause harm or in a good-faith effort to maintain discipline.

Defendants allege that they extracted Plaintiff out of concern for his safety because he had boarded up and they were unable to see him, he refused to verbally engage with them, and he had a history of self-harm. However, Plaintiff had previously boarded up while housed in the Adjustment Center without triggering a cell extraction. Barrett Depo. 61:18-24. According to Plaintiff, AC staff understood that Plaintiff used boarding up as a means of protest and AC staff responded to the first boarding up incident by providing Plaintiff with bedding, clothing, spoon, and food, and by fixing his sink. Barrett Depo. 54:21-56:7. Plaintiff also reports that boarding up does not always result in a cell extraction, and that cell extraction does not always result in an inmate being removed from the cell. Barrett Depo. 53:13-54:5 (describing using boarding up to resolve issues; "nine times out of ten, it will get to the point of where they're like do we really want to use physical force to go in here for a roll of toilet paper or is it a legitimate request to give them a roll of toilet paper."); 40:24-41:25 (describing how cell extractions are averted because the issue that initiated the possible extraction was resolved). In addition, there is nothing in the record indicating a change in Plaintiff's condition or the circumstances between the first boarding up

15

incident and the December 23, 2018 incident that explains why a cell extraction was a necessary response to the second boarding up incident but not the first. At the time of the first boarding up incident, Plaintiff had a history of self-harm and correctional officials were unable to see him. Although Defendants claim that Plaintiff refused to verbally engage with them during the second boarding up incident, Plaintiff reports informing defendant Robinson that there was a problem with his food. Further, Plaintiff reports that when he accused defendant Robinson of lining him up for a shot, defendant Robinson acknowledged his intent to forcibly extract Plaintiff. Viewing the record in the light most favorable to Plaintiff, there thus is a triable issue as to whether a cell extraction was necessary or done in bad faith to harm Plaintiff.

There is also a triable issue of material fact as to whether the force used was a good-faith effort to restore discipline, or was applied maliciously and sadistically to cause harm. Although Plaintiff acknowledges an intent to resist and fight back, he states that he was unable to resist or fight back because he was pinned to the wall immediately after the officers entered; that he only made contact with the shield; and that he never hit an officer. Defendants' version of events conflicts with Plaintiff's version. However, at summary judgment, the Court views the record in the light most favorable to Plaintiff and assumes the truth of the evidence submitted by the nonmoving party. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d at 631; *Leslie*, 198 F.3d at 1158.

Under Plaintiff's version of events, a jury could reasonably find that Defendants knew that Plaintiff's boarding up did not require a cell extraction to protect him from self-harm. Plaintiff reports communicating verbally with defendant Robinson, and a prior boarding up incident did not trigger concerns of self-harm. Similarly, under Plaintiff's version of events, a jury could reasonably find that the force used in the cell extraction was applied maliciously and sadistically to cause harm. Plaintiff alleges that he was pinned to the wall immediately upon Defendants entering the cell and unable to move. A jury could therefore reasonably find that the force needed to secure Plaintiff after he was pinned to the wall would not result in the injuries he suffered – a dislocated elbow, a fractured wrist, and scalp lacerations that required ten staples to close – unless the force was applied sadistically and maliciously to cause harm. If Defendants were aware that

Plaintiff's safety was not at risk and Plaintiff was unable to resist or fight Defendants after they entered, there is therefore a triable issue of fact as to whether Defendants' application of force during the cell extraction was done sadistically and maliciously with the intent to cause harm, in violation of the Eighth Amendment. The Court DENIES Defendants' motion for summary judgment.

### D. Qualified Immunity

Defendants argue that they are entitled to qualified immunity because they did not violate Plaintiff's Eight Amendment rights and because it could not have been evident to a reasonable person that defendants Del Rosario, Faaita, Ramirez, and McLean's "35 or 40-second use of force to secure Barrett's safety was unlawful" or that defendants Adamik and Robinson acted unlawfully in allowing their use of force.

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'" *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.* To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. For a right to be clearly established, there need not be a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond

debate. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. To the extent there are factual disputes regarding what the defendants actually did, at the summary judgment stage, in assessing whether defendant's conduct violated a clearly established right, the Court must resolve those disputes in the plaintiff's favor. *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (first prong of qualified immunity inquiry askes "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" (citing to *Saucier*, 533 U.S. at 201) (alterations in original).

Defendants are not entitled to qualified immunity. At the time of the relevant events, it would have been clear to a reasonable correctional officer that it was unconstitutional to sadistically and maliciously apply force with the intent to cause harm when conducting a cell extraction of an inmate who was already effectively restrained, as Plaintiff alleges happened here. *See Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 784-87, 795-96 (9th Cir. 2018) (upholding denial of qualified immunity on excessive force claim arising out of force applied during cell extractions where plaintiff-inmates testified that correctional officer defendants punched, kicked, and tased them when they either were not resisting or were already pinned down, resulting in broken nose, broken eye socket, broken ankle, broken back, and severe pain from taser). Accepting Plaintiff's version of the facts as true, as required at this stage, a jury could reasonably find that there was no need for a cell extraction and no need for the amount of force used in the cell extraction. A jury could therefore reasonably find that Defendants acted maliciously and sadistically to cause harm. Defendants are not entitled to qualified immunity based on the record currently before the Court.

## CONCLUSION

For the reasons set forth above, the Court orders as follows.

1.  The Court DENIES Defendants' motion for summary judgment. Dkt. No. 15.

2. The case is hereby REFERRED to Magistrate Judge Robert Illman for settlement proceedings pursuant to the Pro Se Prisoner Mediation Program. Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Illman's calendar will permit. Magistrate Judge Illman shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon. The Clerk is directed to serve Magistrate Judge Illman with a copy of this order and to notify Magistrate Judge Illman that a copy of the Court file can be retrieved from the Court's electronic filing database.

3. In view of the referral, further proceedings in this case are hereby STAYED. The Clerk shall ADMINISTRATIVELY CLOSE this case until further order of the Court. If the case is not settled, the Court will enter a new scheduling order for further proceedings.

This order terminates Dkt. No. 15.

**IT IS SO ORDERED.**

Dated: 3/6/2023

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge